WILLIAM Z. SALCER, PANFELD, EDELMAN, et al., a Texas General Partnership, Robert L. Andrews, M.D., Sanjivani C. Bakare, M.D., H.E. Chiles, Ronald Salcer, Alonzo J. Drummond, M.D., George D. Gibson, Gerald I. Green, M.D., William L. Horner, Donald V. McClarty, Stanley W. Mandel, Renato Martinez, M.D., F.J. Mikulenka, Jr., J.B. Randle, Bernard J. Sackaroff, Robert L. Scheer, Jack P. Solovy, Swanson Analysts Systems, Inc. and Bruce L. Weinberger, M.D., Plaintiffs-Appellees;

v.

ENVICON EQUITIES CORP., Envicon Development Corp., Envitex Realty Corp., Venture Development Group Inc., a Texas Corporation, U.S. Southwest Associates, a Texas General Partnership, U.S. Properties/Southwest, a Texas General Partnership, Turning Block Associates, a New York Limited Partnership, Feit & Ahrens, a New York Partnership, William B. Bush, Jr., John W. Galston, Erving Wolf, Harry W. Burrow and Blonder, Seymour & Shapss, a New York Partnership, Defendants-Appellants.

Nos. 1340, 1455–1458, Dockets 84–7183, 84–7185, 84–7187, 84–7189, 84–7191.

United States Court of Appeals, Second Circuit.

Argued June 18, 1984.

Decided Sept. 19, 1984.

Edward Brodsky, New York City (Thomas H. Sear, Robert Knuts, Spengler, Carlson, Gubar, Brodsky & Frischling, New York City, of counsel), for defendants-appellants Envitex Realty Corp., U.S. Southwest Associates, Turning Block Associates and Erving Wolf.

David R. Simon, New York City (Simon & Allen, New York City, Robert H. Jaffe, Jaffe & Schlesinger, Springfield, N.J., of counsel), for plaintiffs-appellees.

Richard A. Kirby, Asst. General Counsel, S.E.C., Washington, D.C. (Daniel L. Goelzer, General Counsel, Jacob H. Stillman, Associate General Counsel, Martha H. McNeely, S.E.C., Washington, D.C., of counsel), for amicus curiae Securities & Exchange Commission.

Solinger, Grosz & Goldwasser, P.C., New York City (Dan L. Goldwasser, Bernard Persky, Joyce M. Perlmutter, New York City, of counsel), for defendant-appellant Blonder, Seymour & Shapss.

Suzanne Antippas, New York City, for defendants-appellants Venture Development Group, Inc. and William B. Bush, Jr.

D'Amato & Lynch, New York City (Richard G. McGahren, Dennis P. Costigan, New York City, of counsel), for defendant-appellant Feit & Ahrens.

Richard W. Schleifer, New York City, for defendants-appellants Envicon Equities Corp., Envicon Development Corp., U.S. Properties/Southwest, John W. Galston, and Harry W. Burrow.

Tax Division, Dept. of Justice, Washington, D.C. (Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paul, Ann Belanger Durney, Attys., Tax Div., Dept. of Justice, Washington, D.C., Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., New York City, of counsel), for amicus curiae United States of America.

Before MANSFIELD, MESKILL and CARDAMONE, Circuit Judges.

MANSFIELD, Circuit Judge:

In this action in the Southern District of New York under § 10(b) of the Securities

Exchange Act of 1934, 15 U.S.C. § 78j(b),[1] and S.E.C. Rule 10(b)5, 17 C.F.R. § 240.-10b–5,[2] plaintiffs seek rescissionary damages for defendants' alleged failure to disclose material information relating to a real estate tax shelter in which the plaintiffs invested. Having been granted an interlocutory appeal pursuant to 28 U.S.C. § 1292(b),[3] defendants challenge the order of Judge Vincent L. Broderick granting plaintiffs' motion to strike defendants' affirmative defense to the effect that any damages must be reduced by the amount of tax benefits admittedly realized by the plaintiffs. Judge Broderick ruled that the defense was inadequate as a matter of law. We reverse.

Plaintiffs are purchasers of 15 partnership interests ("units") in Greenspoint Associates, a limited partnership established to construct, own and operate a residential apartment complex known as "the Greenspoint Project." Defendants are the general partners of Greenspoint Associates and their affiliates, accountants, and attorneys. Plaintiffs purchased their units for $77,500 each between October 1, 1977 and April 30, 1978, based in part on sales literature including an October 1979 Private Placement Memorandum and projections included in a financial analysis dated October 19, 1977.

The literature indicated that Greenspoint Associates was a Texas limited partnership and that the Greenspoint Project was to be a 308-unit multi-family rental complex located in Harris County, Texas, outside of the Houston city limits. Although the Private Placement Memorandum is not part of the record, portions of it were annexed to an affidavit in opposition to plaintiffs' motion to strike. The memorandum stated:

"[I]nvestment in the Units is suitable only for persons of adequate financial means who have no need for liquidity with respect to their investment. Only persons whose income is subject to high rates of income taxation will derive the full economic benefit of the intended tax benefits of this offering."

Plaintiffs alleged in the first count of their Amended Complaint that defendants knew or should have known, and failed to disclose, that the City of Houston was planning to annex that part of Harris County in which the Greenspoint Project was to be built. According to plaintiffs, annexation could be expected to cause a marked increase in the costs of building and operating the project because of (1) the imposition of water, sewer and building permits, certificates of occupancy, sales tax and real

1. "§ 78j. Manipulative and deceptive devices
   "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
   *　*　*　*　*　*
   "(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

2. "§ 240.10b–5. Employment of manipulative and deceptive devices.
   "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
   "(a) To employ any device, scheme, or artifice to defraud,

   "(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
   "(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

3. "(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order...."

estate taxes, (2) additional construction requirements such as water and sewer utility lines, landscaping and sidewalks, (3) additional roofing, plumbing and electrical work needed to comply with Houston's building code, and (4) a delay in the project's completion that would jeopardize the permanent financing described in the sales literature. The City of Houston did annex the area and a forced sale of the premises occurred in September 1981. Each plaintiff received $30,000 per unit as a result of the forced sale and claims a net investment loss of $47,500 per unit. Since the forced sale rendered rescission impossible, plaintiffs seek the latter amount per unit as rescissionary damages.

Each defendant included in the answer to the complaint an affirmative defense asserting that plaintiffs had realized tax benefits stemming from their investment that were in excess of their claimed loss of $47,500. The defenses were premised on the assumption that each plaintiff was taxed at a marginal rate of at least 50% during the years 1977 through 1981, an assumption that plaintiffs do not challenge. There has not, however, been any discovery of the actual tax consequences for each plaintiff. ·

On August 29, 1983, plaintiffs moved for an order pursuant to Fed.R.Civ.P. 12(c), 12(f), and/or 56, to strike these affirmative defenses. Oral argument on the motion was held on December 9, 1983, at which time the parties stipulated that tax benefits were a factor in plaintiffs' decision to purchase their units and that defendants' calculations showing tax benefits to each plaintiff exceeding the $47,500 were correct. Defendants sought discovery for the purpose of proving that "with one or more plaintiffs the sole reason they got into this investment was because of the tax benefits." The district court agreed that "a desire for very extensive tax deductions was a primary motivation for people to invest here, because the whole thrust of the offering letter or the document was to that effect." However, Judge Broderick granted the Rule 12(f) motion to strike at the close of oral argument.

The district court reasoned that although "tax considerations come into this case in determining whether there was in fact a fraud committed," there were effectively two investments at issue: "One was the opportunity to receive currently available but probably rapidly wasting tax benefits or tax deductions or tax shelters. The second part of the bargain was an investment in a capital resource that ultimately they, the [plaintiffs], expected to increase in value" and to "ultimately produce income." The allegations of fraud, said the court, pertained only to the latter aspect of the investment; there had been no claim of fraud with respect to the tax consequences of the Greenspoint Project. The district court then concluded that it "makes no sense to say that any loss to the defrauded investor and hence, any gain or recovery which he is entitled to should be reduced by the tax benefits that he has realized," stating:

> "Those tax benefits would have been realized whether or not there was a fraud in this particular situation.
>
> \*   \*   \*   \*   \*   \*
>
> "The investor who was interested in tax considerations when he invested here could very well have invested in some entirely different company, realized comparable tax benefits, and not suffered the loss that the investors here are alleged to have suffered because of the fraud."

Judge Broderick stressed that the defendants would still be permitted to explore plaintiffs' tax shelter considerations in order to show that these were their prime motivations and that they did not rely on the defendants' alleged fraudulent omissions with respect to annexation of the site by the City of Houston. Since the issue of whether any recovery must be reduced by the amount of tax benefits was critical, plaintiffs having represented that if they received an adverse ruling on that issue they would drop their suit, the district court certified the issue as appropriate for

interlocutory review under 28 U.S.C. § 1292(b).

## DISCUSSION

■ A motion to strike an affirmative defense under Rule 12(f), Fed.R.Civ.P. for legal insufficiency is not favored and will not be granted "unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense." *Durham Industries, Inc. v. North River Insurance Co.*, 482 F.Supp. 910, 913 (S.D.N.Y.1979) (quoting *Lehmann Trading Corp. v. J. & H. Stolow, Inc.*, 184 F.Supp. 21, 22–23 (S.D.N.Y.1960)). *See Mohegan Tribe v. State of Connecticut*, 528 F.Supp. 1359, 1362 (D.Conn.1982); *Meinrath v. Singer Co.*, 87 F.R.D. 422, 429 (S.D.N.Y.1980); *Wellman v. Dickinson*, 79 F.R.D. 341, 349 (S.D.N.Y.1978); *Sample v. Gotham Football Club, Inc.*, 59 F.R.D. 160, 168 (S.D.N.Y.1973); *Carter-Wallace, Inc. v. Riverton Laboratories, Inc.*, 47 F.R.D. 366, 367 (S.D.N.Y.1969). Moreover, even when the facts are not disputed, several courts have noted that a "motion to strike for insufficiency was never intended to furnish an opportunity for the determination of disputed and substantial questions of law." *Carter-Wallace, Inc. v. Riverton Laboratories, Inc.*, *supra*, 47 F.R.D. at 367–68 (quoting *Budget Dress Corp. v. International Ladies' Garment Workers' Union*, 25 F.R.D. 506, 508 (S.D.N.Y. (1959)); *see also Augustus v. Board of Public Instruction*, 306 F.2d 862, 868 (5th Cir.1962); *Mohegan Tribe v. State of Connecticut*, *supra*, 528 F.Supp. at 1362; *Wellman v. Dickinson*, *supra*, 79 F.R.D. at 349; *Systems Corp. v. American Telephone & Telegraph Co.*, 60 F.R.D. 692, 694 (S.D.N.Y.1973). This is particularly so when, as here, there has been no significant discovery.

"[E]ven when the defense presents a purely legal question, the courts are very reluctant to determine disputed or substantial issues of law on a motion to strike; these questions quite properly are viewed as determinable only after discovery and a hearing on the merits." 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1381, at 800–01 (footnotes omitted). To do otherwise would be to run the risk of offering an advisory opinion on an abstract and hypothetical set of facts. *See Lunsford v. United States*, 570 F.2d 221, 229–30 (8th Cir.1977). *Accord Green Mountain Power Corp. v. General Electric Corp.*, 496 F.Supp. 169, 171 (D.Vt.1980); *S.E.C. v. Gulf & Western Industries*, 502 F.Supp. 343, 347 (D.D.C.1980); *Sample v. Gotham Football Club*, *supra*, 59 F.R.D. at 169; *Wellman v. Dickinson*, *supra*, 79 F.R.D. at 351.

■ The legal issue on the present appeal is substantial and disputed. We have never addressed the question of whether, in an action alleging fraud with respect to a tax shelter investment, the plaintiff's recovery must be reduced by tax benefits received. Those courts considering the question have reached differing conclusions. *Compare Burgess v. Premier Corp.*, 727 F.2d 826, 837–38 (9th Cir.1984) (not requiring reduction) *with Austin v. Loftsgaarden*, 675 F.2d 168, 180–84 (8th Cir.1982) (requiring deduction). Thus the law on this point is confused and unsettled. For reasons set out below, further facts must be obtained before the issue can definitively be resolved in this case. It was therefore error to strike the affirmative defenses.

■ In deciding what damages may be recovered for fraud in violation of the Securities Exchange Act we are governed by § 28(a), 15 U.S.C. § 78bb(a),[4] which limits damages in a civil suit based on violation of the Act to "actual damages on account of the act complained of." As we stated in *Osofsky v. Zipf*, 645 F.2d 107, 111 (2d Cir. 1981):

---

4. "(a) The rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity; but no person permitted to maintain a suit for damages under the provi-

sions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of . . . ."

"[T]he purpose of section 28(a) is to compensate civil plaintiffs for economic loss suffered as a result of wrongs committed in violation of the 1934 Act, whether the measure of those compensatory damages be out-of-pocket loss, the benefit of the bargain, or some other appropriate standard."

"Actual damages," as used in the Exchange Act, means "compensatory damages," *id.*, and hence a plaintiff cannot recover more than his or her "net economic loss." *Marbury Management, Inc. v. Kohn,* 470 F.Supp. 509, 516 (S.D.N.Y.1979), *aff'd in part, rev'd in part,* 629 F.2d 705 (2d Cir.), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980). It is not within our power to ignore benefits bargained for and received by plaintiffs as a result of the transaction at issue, which represent real economic value mitigating any loss they may have suffered.

One of the prime motivations for investment in limited real estate partnerships is the unique tax advantage made available to high tax bracket individuals. The partnership as an entity is not subject to taxation. It serves as a conduit through which partnership losses are passed on to the partners, thus providing a shelter to offset the investor's other taxable income to the extent of the adjusted basis of the investor's interest in the partnership. *See Austin v. Loftsgaarden, supra,* 675 F.2d at 173; Note, *Real Estate Limited Partnerships and Allocational Efficiency: The Incentive to Sue for Securities Fraud,* 63 Va.L. Rev. 669, 673 (1977). Indeed, in some such partnerships the investor's potential deductible losses may be increased, at least for a few years, to a point equalling the partner's original investment through use of accelerated depreciation methods, prepayment of mortgage interest, legal and accounting fees, commitment fees incurred

in obtaining financing to buy the mortgaged property, and the like, with taxation on any gain deferred until the investment is liquidated. *Id.* at 672–75. Even assuming that the investor's ultimate goal is to realize a gain from an income-producing business (either through sale or income), the intervening tax benefits to the partner represent an important tangible economic advantage expected to be derived from his investment regardless whether the venture eventually operates at a profit. The importance of this aspect of the investment is recognized in decisions awarding damages for failure of the tax advantages of shelters to live up to the seller's representations. *See, e.g., Sharp v. Coopers & Lybrand,* 649 F.2d 175 (3d Cir.1981) (holding accounting firm liable for acts of employee in preparing tax opinion letter), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982). In short, the investor normally pays a higher price for a tax shelter investment than for one involving simply future growth or income. *See* 4 R. Haft & P. Fass, *Tax Sheltered Investments,* Intro-8 to 9 (3d ed. 1981).

In the present case the district court took the view that at least a portion of plaintiffs' investment was made to realize tax benefits and the balance with a view to an income or appreciation potential.[5] Even given this theory the $77,500 investment in each unit, to the extent that it was paid for the opportunity to secure tax benefits, would not be rescindable since plaintiffs realized all of the tax benefits for which they bargained. Thus, using the district court's theory, it was error to grant the motion to strike without first making a factual determination of the allocation of the purchase price between the tax and appreciation components. To the extent that plaintiffs invested in a tax shelter, all

---

**5.** Upon appeal the SEC as amicus curiae takes the same view, stating (1) that "There is no claim in this case that the fraud undermined the legitimacy of the tax shelter treatment," SEC Brief 4, note 3, (2) that normally the purchase price includes "a premium representing the opportunity to obtain future tax benefits," *id.* 8, and (3) that "since the allegations of fraud relate

only to the investment aspects of the project and there is no claim that the fraud affected the price paid for the tax shelter feature, the defendants would be liable in out-of-pocket damages only for the investment loss and would retain the initial premium paid for the right to future tax benefits," *id.,* 9.

benefits they received from their investment, including tax benefits, would have to be deducted in calculating the rescissionary damages, if any, to which they would be entitled.

■ Plaintiffs, joined by the Securities and Exchange Commission appearing as *amicus curiae*, argue that the district court's striking of the defense was proper because by refusing to "give the defendants credit" for tax benefits received by the plaintiffs it created an additional incentive for "private attorneys general" to file civil suits based on the securities laws. Regardless of the accuracy of that assumption, it is not for us but for Congress to create such incentives, *see, e.g., Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 263, 95 S.Ct. 1612, 1624, 44 L.Ed.2d 141 (1975) (shifting of attorneys fees by court to create incentive is impermissible), and Congress has demonstrated that it knows how to deter and punish securities fraud by enacting a series of laws authorizing proceedings without proof of actual damage required by Rule 10b–5, e.g., proceedings by the SEC and IRS, either in court or by administrative action, to enjoin fraudulent conduct or obtain disgorgement; criminal prosecutions and actions for civil fines. *Cf. Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). We are barred from engaging in judicial legislation by § 28(a) of the Exchange Act, which limits plaintiffs to recovery of their actual net economic loss and does not give us discretionary power to increase that amount in order to encourage the filing of private damage actions. In applying § 28(a) we cannot ignore the substantial economic tax benefits bargained for and realized by plaintiffs.

Nor can we agree with the notion that our ruling makes "the government the banker for fraudulent tax shelter activity," *Burgess v. Premier Corp., supra*, 727 F.2d at 838. As Judge Broderick noted, there was no such activity in this case; the fraud, if any, pertained only to the investment aspects of the Greenspoint Project.

The government got the residential development that it hoped to encourage by offering the tax benefits taken by the plaintiffs. Thus, it is "banking" precisely what it agreed to "bank." There is no suggestion that the project did not meet federal requirements as a viable housing development entitling its owners to tax benefits.

■ For the same reasons plaintiffs' argument that defendants are not entitled to "credit" for the tax benefits because the latter were "provided" by the government rather than by the defendants must be rejected. The standard established by § 28(a) for determining the amount of damages to be awarded is not the egregiousness of the defendants' conduct but the extent of plaintiffs' actual injury. To ignore the sizeable tax benefits actually realized by the plaintiffs would be unrealistic. There is nothing improper or unusual in taking tax considerations into account in determining the amount of damages to be awarded. *See Norfolk & Western Railway Co. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980); *O'Connor v. United States*, 269 F.2d 578 (2d Cir.1959).

In an effort to avoid being credited with their realized tax benefits resulting from their investment in the tax shelter plaintiffs, joined by the S.E.C., argue that the tax benefits here should fall within the "collateral source" rule, which prohibits taking into consideration benefits received from third parties as the result of wholly separate and distinct transactions, such as those received under insurance policies negotiated independently. Restatement (Second) of Torts § 920A(2) (1979). A classic example is the court's ruling in a personal injury action that a plaintiff's recovery is not to be reduced by any insurance proceeds received under his independent insurance policy in which the defendant played no part.

■ The essence of the collateral source rule is the independence of the transaction giving rise to the collateral source, such as the insurance policy. Here, in contrast, the tax benefits, although paid by the government, emanate directly from

the tax shelter sought by the plaintiffs and provided by defendants, without which plaintiffs could not have realized any tax benefits. Benefits resulting directly from a transaction under attack must be credited toward the damage award. *See* Jacobs, *The Measure of Damages in Rule 10b–5 Cases,* 65 Geo.L.J. 1093, 1159–60 (1977). Indeed, the SEC has recognized that tax benefits are an inextricable part of real estate limited partnership tax shelter offerings by issuing Guidelines (e.g., SEC Guideline 60, which was in effect during the relevant period in this case) requiring the issuer to disclose the prospective tax benefits that might be realized from the investment. The fact that the tax benefits were paid by the government rather than by the defendants does not lessen the defendants' role in securing them. To hold otherwise would be to confer an undeserved windfall upon the plaintiffs. Assuming proof that the $77,500 investment per unit was induced by fraud, not only would they retain the $97,866 per unit already received ($30,000 upon liquidation plus $67,866 tax savings) but they would gain another $47,500 (i.e., the difference between the $77,500 paid per unit and the $30,000 per unit received upon liquidation) for a total of $145,366.

The SEC's further argument that the plaintiffs' tax benefits should not be offset against their damages because the benefits are equivalent to pre-judgment interest must be rejected out of hand. The suggestion that net tax benefits of $63,866 received by the plaintiffs during the period 1977–81 on their investment of $77,500 for the period 1977–79 amounts to pre-judgment interest is so unrealistic and disproportionate as to border on the frivolous. If any pre-judgment interest is due in the present case, the amount can be calculated by the district court. Treatment of tax benefits as interest, aside from being fictional, would be wholly unnecessary.

The Tax Division of the U.S. Department of Justice, also appearing as amicus curiae in opposition to reduction of plaintiffs' recovery by the amount of the tax benefits, does not go as far as the SEC and plaintiffs, both of whom contend that tax benefits should be disregarded as a matter of law in calculating damages recoverable under § 28(a) of the Exchange Act. The Tax Division argues instead that the district court's ruling should be affirmed because the tax benefits in any given case may prove to be illusory: "Depending upon the circumstances of each case, the Internal Revenue Service may challenge the original deductions, the tax treatment required upon sale or other disposition of the investment, and the tax treatment of any damages recovered, all of which may cancel, in whole or in part, prior tax benefits." Brief at 5. This was the rationale used by the Ninth Circuit in *Burgess v. Premier Corp., supra,* and by the district court in *Western Federal Corp. v. Davis,* 553 F.Supp. 818 (D.Ariz.1982), *aff'd sub nom. Western Federal Corp. v. Erickson,* 739 F.2d 1439 (9th Cir.1984).[6] However, the mere possibility that the I.R.S. may later challenge the plaintiffs' tax benefits is not sufficient for us at this stage of the litigation simply to ignore those benefits. There must first be some showing of facts *in this case* that would justify such a challenge by the I.R.S. So far the government has not pointed to any evidence indicating that the tax benefits were improperly claimed by plaintiffs or that they will be recaptured or offset. None of the immediate parties to this litigation question the legality or amount of the tax benefits.

Despite the fact that plaintiffs took the deductions during the period from 1977–81, thereby giving the I.R.S. several years to challenge them, it has not sought to disallow them. Indeed, the government merely speculates that it *"may"* challenge them some time in the future and that it is possible that they *"could* be denied in whole *or in part"* (emphasis added).

---

**6.** Although the plaintiffs cite this court to the results in *Burgess* and *Western Federal Corp.,* they nevertheless reject the rationale of those decisions. The plaintiffs share the defendants' view that the tax benefits are not illusory.

Brief at 5. Ignoring its own inaction in the matter the I.R.S. objects to the suggestion that the court might evaluate the issue in this litigation (the course taken by the 8th Circuit in *Austin v. Loftsgaarden, supra,* where an I.R.S. audit was already in progress) on the ground that the court would be "second-guessing" whether and to what extent the tax shelter deductions might be disallowed by the I.R.S. We disagree. The government's equivocal position on the issue leaves nothing to be second-guessed. If the I.R.S.'s position is that the plaintiffs are not entitled to the tax benefits they took, its duty is to disallow the deductions rather than attempt to place the issue in limbo indefinitely. Despite ample time for an audit and initial decision it has failed to act.

The government's next argument, that tax losses claimed and taken by the plaintiffs during the Greenspoint Project's early years would be subject to "recapture" by the I.R.S. upon sale of the apartment project at any time prior to expiration of its service period, needs little discussion. Since the building was in fact sold at a substantial loss in 1981, any recapture would already have occurred. Provisions requiring a portion of the gain upon sale to be treated as ordinary income, *see Commissioner v. Tufts,* 461 U.S. 300, 103 S.Ct. 1826, 1829 n. 2, 75 L.Ed.2d 863 (1983), therefore have no application to this case.

Another theory offered by the Justice Department's Tax Division, the "tax benefit doctrine," is equally unpersuasive as a ground for not taking the tax benefits realized by plaintiffs into account in calculating their damages. Under the "tax benefit doctrine" a taxpayer who claims a deduction resulting in a tax benefit for one year and then later obtains a recovery or repayment that is inconsistent with the premise underlying the deduction must include the recovery in ordinary income. *See Hillsboro National Bank v. Commissioner,* 460 U.S. 370, 103 S.Ct. 1134, 75 L.Ed.2d 130 (1983). The government argues that any rescissionary damages recovered by the plaintiffs would be the equivalent of full rescission of their original purchase, put-

ting them in the same position as if they had never owned the tax shelter investment, and that since such recovery would therefore be inconsistent with their claiming deductions as owners the deductions would be offset by income taxes due on their recovery in this action.

■ The contention that the tax benefit doctrine applies to this case suffers from some basic misconceptions. It fails to distinguish between actual rescission, which is impossible in this case because of the forced sale of the project, and rescissionary damages, which are not the same as rescission and may be awarded when actual rescission is unavailable. *See* 5C A. Jacobs, *Litigation and Practice under Rule 10b–5,* § 260.03(c)(vi)(a) (1984). If this were a case of actual rescission such as *Burgess v. Premier Corp., supra,* which is distinguishable on that ground, the tax benefit doctrine might apply, as was held in that case. In that event, however, the plaintiffs would not be required to amend their prior years' tax returns to eliminate the deductions taken (which the *Burgess* court erroneously assumed) but to report the money judgment later recovered as taxable income. See *Hillsboro National Bank v. Commissioner, supra;* J. Mertens, 1 *Law of Federal Income Taxation* § 7.37. If the district court in the present suit for rescissionary damages concluded, as it would have the power to do, that the tax benefits should be offset against the $47,500 damages claimed, the remedy, although labelled "rescissionary" damages, would not be inconsistent with the plaintiffs' prior tax position. It would not be a return of the plaintiffs to the same position they would have occupied if they had never made the investment but merely an award of damages after crediting them with their tax benefits. In short, the "tax benefit doctrine" does not dictate the district court's decision but depends for its applicability upon the substance of that decision. To hold as the government urges would put the cart before the horse.

Lastly it has been suggested that the tax benefits should not be offset against the plaintiffs' investment because if there had been a full disclosure of Houston's intent to annex the land beneath the Greenspoint Project the Project would never have been built. This circular reasoning ignores the fact that the Project apartments have been built, triggering application of the tax incentives for investing in the costs involved, including financing, construction and operation. Although an increase in these costs might affect the price and ownership of the limited partnership units, depending on the investors' tax brackets and the tax benefits to be realized, there is no record evidence that the Project would not have been constructed if the City's prospective annexation had been revealed and no legal basis has been advanced for refusing to credit the plaintiffs with the tax benefits on the mere speculation that but for the alleged fraud the apartment complex would not have been built.

## CONCLUSION

This appeal presents a classic example of the principle that a motion to strike should not be granted when there exist material issues that can only be resolved after the facts are known. Accordingly the order is reversed and the case remanded for further proceedings in accordance with this opinion.