**William A. GARDNER and Sidney L. Hofing, Plaintiffs,**

v.

**Frank SURNAMER, Bruce Rothrock and Saul Schussel, Defendants.**

Civ. A. No. 82–2723.

United States District Court, E.D. Pennsylvania.

April 17, 1985.

Antoinette R. Stone, Philadelphia, Pa., for plaintiffs.

Leon H. Kline, Philadelphia, Pa., for Rothrock.

Alan M. Black, Allentown, Pa., for Surnamer.

Edward C. McCardle, Allentown, Pa., for Schussel.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

Presently before me are defendants' motions for summary judgment on Count II of plaintiffs' complaint which alleged a violation of the Securities Exchange Act of 1934 ("Act"), 15 U.S.C. § 78j(b), and the regulations promulgated thereunder, including Rules 10b–5 and 10b–6. 20 C.F.R. §§ 240.-10b–5 & 240.10b–6.

### Background

On September 10, 1981 plaintiffs and defendants Rothrock and Surnamer [1] entered into an agreement under which plaintiffs purchased a fifty-one percent stock interest in Jordan Industries, Inc. ("Jordan"), and a fifty percent interest in Central Valley Real Estate ("Central"). The combined purchase price of these securities was $525,-000, although the parties hotly contest the amounts exchanged. Eleven days later, on September 21, 1981, plaintiffs transferred some or all of this stock to Gardner Technology Associates ("GTA"), a Pennsylvania limited partnership.[2] Once again, the par-

---

[1] The complaint also names Saul Schussel as a defendant and he has moved for summary judgment along with defendants Rothrock and Surnamer. Schussel provided a review of the balance sheet of Jordan Industries and other related statements before the sale of securities at issue here. Because the principal arguments in the present motions concern the actions of the other defendants, all references to defendants in this opinion will be to defendants Rothrock and Surnamer.

[2] This transaction also involved other individuals. The initial agreement for the sale of the stock in Jordan and Central was between the general partners of GTA and the defendants along with Sylvan Zemel and David Chapman who owned an interest in Jordan and Central. Zemel and Chapman are not named as defendants in this suit. They also appear to be limited partners in GTA.

ties do not agree on the terms or nature of this transfer.

After this transfer, plaintiffs allege that GTA became aware that Jordan and Central were riddled with undisclosed liabilities and that the assets of the businesses were not as represented by the defendants at the time of the initial sale to plaintiffs. The exact nature of these misrepresentations is more fully discussed in an earlier opinion in this case in which I granted defendants' motion to dismiss plaintiffs' civil RICO claim. *Gardner v. Surnamer,* 599 F.Supp. 477 (E.D.Pa.1984).

Defendants have now moved for summary judgment on the securities law count of the complaint. The basis of these motions is the argument that plaintiffs have suffered no actual damages and therefore cannot maintain a § 10(b) action. Plaintiffs deny that they have suffered no damages and assert that even if they have no cause of action in their personal capacities, they can still maintain this action as assignees of GTA.

Summary judgment may be granted when it has been established that there are no issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Small v. Seldows Stationery,* 617 F.2d 992 (3rd Cir.1980). The court does not decide issues of fact, but merely determines if there is an issue of fact to be tried. *Ettinger v. Johnson,* 556 F.2d 692 (3rd Cir.1977). The facts must be viewed in the light most favorable to the non-moving party and any reasonable doubt as to the existence of a genuine issue of fact is to be resolved against the moving parties. *Continental Ins. Co. v. Bodie,* 682 F.2d 436 (3rd Cir. 1982). For the reasons set forth below, defendants' motions will be denied.

*Plaintiffs' Ability to Pursue this Action on Their Own Behalf*

Count II of plaintiffs' complaint is based on § 10(b) of the Securities and Exchange Act of 1934 which states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Defendants argue forcefully that plaintiffs cannot maintain this action on their own behalf because they have not suffered any actual damages. The courts have universally applied the "actual damage" standard of § 28(a) of the Act to § 10(b) claims. *See* 15 U.S.C. § 78bb(a). Such "actual" damages are an essential element of a cause of action under § 10(b). *Gould v. American-Hawaiian S.S. Co.,* 535 F.2d 761 (3rd Cir.1976); *Rubenstein v. I.U. Inter'l Corp.,* 506 F.Supp. 311 (E.D.Pa.1980). Defendants argue that "actual damages" should be equated with "out of pocket" losses, and that under any formulation, plaintiffs have reaped substantial profits from their eleven day ownership of the stock in question.

In general:

Most courts have construed the term "actual damages" to preclude punitive awards and to limit compensatory damages to the plaintiff's actual monetary loss, including consequential damages. The courts further define a monetary loss as money actually paid out by a plaintiff and not as money a plaintiff hoped to realize. As a result, the courts are in almost unanimous agreement that the out-of-pocket measure of damages which operates to make plaintiff whole, applies to Rule 10b–5 violations with only limited exceptions.

Note, Reaping the "Fruits of an Unrealized Speculation": May a Buyer Who Profits from a Transaction also Recover Damages

Under Rule 10b–5, 33 Rutgers L.Rev. 973, 975–76 (1981).

In *Abrahamson v. Fleschner*, 392 F.Supp. 740 (S.D.N.Y.1975), the court was faced with a situation which is somewhat similar to the one presented in the present case. That case also involved a 10b–5 action in which plaintiffs, who were limited partners, sued the partnership, its three general partners, and its accounting firm for a variety of alleged misrepresentations. Defendants moved for summary judgment arguing, *inter alia*, that plaintiffs had not suffered any actual damages and therefore could not state a claim under Rule 10b–5. The court accepted this argument in spite of the fact that plaintiffs represented to the court that they could have made more money than they actually did were it not for the fraud of the defendants. The court stated: "[a] close reading of the cases relied upon by plaintiffs reveals no support for their claim that they are entitled to damages in a situation where no loss has been suffered and where a substantial gain has in fact been made." *Id.* at 746–47. *See also Rubenstein*, 506 F.Supp. at 318.

■ Similarly, in *Beissinger v. Rockwood Computer Corp.*, 529 F.Supp. 770, 788–89 (E.D.Pa.1981), the court posed a hypothetical which reflects fairly closely the facts of this case. In its discussion of plaintiff's theory of damages the court stated:

> Assuming that a class member purchased his Rockwell stock in mid-July, 1971, the price of those shares would have been around $5.75 per share whereas their true value was approximately $3.75 per share.... Further assuming that the price of Rockwood stock followed the general market trends and that the price—"true value" spread remained constant, if the same class member later sold his stock for approximately $3.00 per share, its true value would have been approximately $1.00 per share. Obviously, because he would have received $2.00 per share more than the stock was actually worth at the time of sale, such a class member would have

recovered the "cost" of the misrepresentation to him and would therefore have suffered no damages.

*Id.* at 789. Stated another way, if a buyer of securities purchases securities which are inflated in price because of fraud and sells those securities later at a price which is still inflated by the same fraud, he or she has suffered no actual damages all other things being equal.

The determination of whether plaintiffs have suffered any actual damages therefore depends on an analysis of the transactions between plaintiffs and defendants and plaintiffs and GTA.

■ Plaintiffs paid $400,000 for the stock in Jordan and $125,000 for the interest in Central. Thus at a minimum, plaintiffs spent $525,000 for the securities at issue here. Plaintiffs claim, however, that the total purchase price was much higher. They would include two additional items in the purchase price. These are $26,000 in brokerage fees paid in connection with the sale and $33,177 paid directly to defendant Surnamer. After reviewing the voluminous materials submitted by the parties in support or opposition to these motions, I feel that there can be no dispute that neither of these two items is properly included in the calculation of the purchase price paid by plaintiffs.

With regard to the $26,000 brokerage fee, this amount was apparently paid to the broker by Jordan and not by plaintiffs. Affidavit of William Jackson ¶¶ 4 & 5. The brokerage fee was billed on an invoice made to Jordan and was paid by a Jordan check. *Id.* Plaintiffs claim that this fee was paid by Jordan, but that it was in reality an obligation of plaintiffs and that the $26,000 was an interest free loan from Jordan to plaintiffs. Plaintiffs further allege that some of this money has been repaid to Jordan, and that some is still owed. Plaintiffs provide no further substantiation for this claim aside from a paragraph in their response to the motions for summary judgment even though plaintiff Hofing has provided an affidavit in opposition to the motions. Under Rule 56(e), a

party must respond to affidavit facts with more than a restatement of the pleadings. Plaintiffs have not provided any affidavit or other materials which would rebut the facts contained in the affidavit of the broker. I therefore find no material issue of fact with regard to the $26,000 brokerage fee, and conclude that the fee was paid by Jordan and not by plaintiffs.

At the time of purchase, plaintiffs apparently paid $33,177 directly to defendant Surnamer. This payment was essentially made to "purchase" a subordinated loan payable from Jordan to Surnamer. At the time of the original sale Surnamer agreed to assign the loan payable from Jordan to him to plaintiffs. *See* Defendants Surnamer and Rothrock's motion for summary judgment, Exhibit A. This loan was not transferred from plaintiffs to GTA at the time of summary judgment. *See* Defendants Surnamer and Rothrock's Motion for Summary Judgment, Exhibit B. Presumably, this obligation is still owed by Jordan to plaintiffs; plaintiffs have provided me with no material from which I could conclude otherwise. I will, however, assume for the purposes of this motion that the $33,177 was a bona fide portion of the purchase price.

The terms of the subsequent exchange of plaintiffs' stock to GTA is equally disputed. It is clear, however, that on September 21, 1981, plaintiffs entered into an agreement with Capital Partners Management Co., Inc. ("Capital"), one of the general partners of GTA, to transfer their interest in Jordan and Central to GTA in exchange for limited partnership units in GTA. It appears that at the time of this exchange, each unit in GTA was worth $65,000 payable in two installments of $25,000 each together with the delivery of a $15,000 letter of credit in favor of GTA. Defendants Surnamer's and

Rothrock's motion for summary judgment, Exhibit C & Exhibit D. Thus, the twelve shares would theoretically be valued at $780,000. Plaintiffs do not dispute that they received $600,000 of value in this transfer; they claim, however, to be still obligated to provide the letters of credit. Unfortunately for this argument, they have not provided these letters of credit in the almost four years since this transaction took place. As of the present time, therefore, plaintiffs have received units in GTA which would otherwise have cost them $780,000.

■ Even if I were to assume the figures most favorable to plaintiff, I would be forced to conclude that plaintiffs did not suffer any actual damages *personally* from any fraud allegedly committed by defendants. Assuming the figures most favorable to plaintiffs, they purchased the stock in Jordan and Central for approximately $585,000. They exchanged this stock for $600,000 worth of units in GTA thus realizing a profit of $15,000 in eleven days. Moreover, for the reasons stated above, I have concluded that the purchase price was substantially less than $585,000 and the value received from GTA substantially more than $600,000.[3] Thus, there can be no dispute that plaintiffs have not sustained any actual damages as a result of any fraud in connection with the sale of the securities in question.

Plaintiffs argue however that even if they cannot maintain an action on behalf of themselves, they can maintain this action because they hold an express assignment of GTA's action against defendants.

*Plaintiffs' Ability to Pursue This Action As Assignees of GTA*

Plaintiffs argue that they can proceed in this action as assignees of GTA's cause of

**3.** I also note that by acquiring limited partnership interests in GTA, plaintiffs became eligible to receive large tax advantages. Plaintiff Hofing had GTA tax write-offs of $283,815.00 in 1981. Defendants Surnamer and Rothrock's motion for summary judgment, Exhibit G. Defendant Gardner filed no tax returns for either 1981 or 1982. Defendants' Surnamer's and Rothrock's motion for summary judgment, Gardner Deposition, Exhibit H. I need not de-

termine whether these savings did actually accrue in light of my decision that there can be no dispute regarding the fact that plaintiffs made a profit on their sale to GTA. If they did accrue then they may be considered along with the other benefits obtained from GTA in determining the extent of plaintiffs' actual losses, or in this case, profits. *See Salcer v. Envicon Equities Corp.,* 744 F.2d 935 (2d Cir.1984); *Austin v. Loftsgaarden,* 675 F.2d 168 (8th Cir.1982).

action against defendants. This argument has several components. First, can plaintiffs receive a assignment of a cause of action from GTA under § 10(b) and Rule 10b–5? Second, if such an assignment is possible, has one taken place here? Third, is the assignment herein valid? Fourth, if it is valid, did GTA ever have a cause of action that it could assign? I will examine each of these issues *seriatim*.

*Assignment of Causes of Action Under Section 10(b) and Rule 10b–5*

■ Before I can determine whether section 10(b) rights are assignable, I must first determine whether state or federal law is to be applied to that determination. There exists little law on this point, presumably because it has been assumed that questions of standing under the federal securities law must be governed by federal law. In *Lowry v. Baltimore & Ohio Railroad Company*, 707 F.2d 721 (3d Cir.1983), a case also involving the assignability of § 10(b) rights, Judge Garth, in a concurring opinion, stated that "questions regarding rights under the federal securities law must be decided on the basis of federal, and not state law." *Id.* at 727. I agree with Judge Garth and am satisfied that in order to best effectuate the policies behind the federal securities laws I should look to principles of federal law.

The next issue presented is whether, under federal law, § 10(b) rights are assignable. The starting (and ending) point of this analysis is the Third Circuit's decision in *Lowry*. In that case, the court, sitting *en banc* split on this issue. Six of the eight judges did, however, hold that § 10(b) rights could be assigned. *Id.* at 723. Although a majority of the court agreed that such rights could be assigned, the court split over what was necessary to effectuate such an assignment. Three judges held that an assignment took place automatically on the sale of a security. *See Id.* at 734

(Gibbons, J., dissenting); 744 (Seitz, C.J., and Becker, J., concurring in part and dissenting). Three held that an assignment of such rights must be express. *See Id.* at 723 (Garth, J., and Sloviter, J., concurring in the judgment); 731 (Adams, J., concurring in the judgment). In the present case, it is clear that an express assignment took place. McDonald Affidavit, Exhibit A, Hofing Affidavit ¶¶ 2 & 3, Exhibit A. Thus, the *Lowry* majority would presumably find a valid assignment of GTA's rights under § 10(b) and Rule 10b–5 to have taken place.

In the present case, plaintiffs produced the minutes of a directors meeting of Capital at which Capital, acting as GTA's general partner, purported to assign GTA's cause of action to plaintiffs. Gardner, as a director of Capital (and presumably as a general partner of GTA) voted to assign GTA's rights to himself and Hofing.

■ Defendants have raised some weighty arguments in opposition to this theory. First, they correctly note that there is no mention of the fact that plaintiffs are suing only as assignees in the complaint. Although the complaint does speak of plaintiffs as though they were the real parties in interest in this suit,[4] I refuse to read the rules of pleading as narrowly as defendants would suggest. What plaintiffs have asserted in this theory is really factual in nature, and it appears that defendants had notice of this theory well before the close of discovery. I agree with defendants that the mere statement of this theory in a response to motions for summary judgment without a prior mention in the complaint, standing alone, suggests that the theory is a sham. In the present case, however, there is evidence submitted by way of affidavit which substantiates plaintiffs' claim that on December 14, 1981,

---

4. It is well established under Pennsylvania law that the real party in interest in an assigned suit is the assignee and not the assignor in a case like this one where the assignment itself seems unequivocal. *See, e.g., Ertel v. McCloskey*, 167 Pa.Super. 120, 74 A.2d 652 (1950); *Bush v. Eastern Uniform Co.*, 356 Pa. 298, 51 A.2d 731 (1947); *Casey Heat Service Co. v. Klein*, 55 D & C 293, 46 Lack.Jur. 257 (1945).

GTA's general partners decided to assign its rights in any suit arising from the sale of the securities at issue here to plaintiffs. Defendants have raised substantial question regarding the validity of this assignment through the use of the deposition testimony of Gardner. At best, however, this serves to illustrate that there exists a genuine issue of fact regarding the validity of the assignment.

I decline to decide that this assignment is invalid in the context of the present motion for summary judgment.

Defendants contend, however, that even if the assignment were made in December, 1981, it is void as against the public policy disfavoring champertous contracts.

In evaluating this argument I must adopt and apply state law. *See Lowry* 707 F.2d at 747 (Seitz, C.J. dissenting). The parties do not seem to dispute the applicability of Pennsylvania law to this issue.

■ Under Pennsylvania law, an arrangement offends the public policy against champerty and is illegal if it provides for the institution of litigation by and at the expense of a person who, but for the agreement, has no interest in it, with the understanding that his or her reward is to be a share of whatever proceeds the litigation may yield. *Richette v. Pennsylvania R.R.*, 410 Pa. 6, 20, 187 A.2d 910 (1963), *Ames v. Hillside Coal & Iron Co.*, 314 Pa. 267, 171 A. 610 (1934). In determining whether an agreement is champertous there are three elements which must be considered. First, the party involved must be one who has no legitimate interest in the litigation. Second, that party must expend his or her own money in prosecuting the suit, and finally, he or she must be entitled by the bargain to a share in the proceeds of the suit. *Belfonte v. Miller*, 212 Pa.Super. 508, 243 A.2d 150, 152 (1968).

■ Viewed in this light, I find one of the three necessary prongs missing in the present case: the lack of interest the party must have in the suit. Here, Mr. Gardner, the co-general partner of GTA and Mr. Hofing, a limited partner of GTA, had an interest in GTA's profits at the time of the assignment. Moreover, Mr. Gardner has an additional interest in the claims against the defendants because he, as a general partner, is personally liable for the debts of the limited partnership. Thus, while the assignment may meet two prongs of the test, it clearly fails this first prong. Accordingly, under Pennsylvania common law, champerty is not present.

■ Even if, however, GTA could have assigned its cause of action under § 10(b) to plaintiffs, the question of what there was to be assigned remains. It is axiomatic that the rights of an assignee can rise no higher than those of the assignor. *Himes v. Cameron County Const. Co.*, 497 Pa. 637, 444 A.2d 98 (1982); *United States Steel Homes Credit Corp. v. South Shore Development Corp.*, 277 Pa.Super. 308, 419 A.2d 785 (1980). Thus, I must determine whether, on the present record, plaintiffs have demonstrated that an issue of material fact exists regarding the ability of GTA to bring the present lawsuit. If GTA had no cause of action against defendants then neither do plaintiffs as assignees of GTA.

Plaintiffs assert two independent theories regarding the ability of GTA to maintain this suit against defendants. First, they argue that plaintiffs acted in the original transaction with defendants as mere agents of GTA, their undisclosed principal. Second, they argue that GTA could maintain this suit under the securities law even if it were a genuine purchaser from plaintiffs.

■ Plaintiffs' undisclosed principal argument is completely unpersuasive. They claim that at the time of the original sale of the securities from defendants to plaintiffs, they were operating as agents of GTA. I have reviewed the available record in this case carefully and can find no substantial support for this argument. The facts on

record are replete with circumstantial evidence that is inconsistent with the agency theory propounded. First, I note that as a result of the two transactions involved here, plaintiffs as individuals received large profits over a brief period. The transfer of the stock to GTA took place eleven days after the first sale to plaintiffs. Moreover, the agreement between Capital and plaintiffs is very elaborate and contains detailed warranties and other obligations that are somewhat at odds with plaintiffs' agency theory.

The original sale on September 10, 1981 was financed by a loan from First National State Bank to plaintiffs as individuals. Defendants' reply memorandum in support of their motion for summary judgment, Exhibit F. I also note that GTA's initial tax returns stated that GTA did not commence business until September 30, 1981. *See* Verified statement of Leonard Michaels. Perhaps the most damaging bit of evidence against plaintiffs' agency theory is contained in the deposition of plaintiff Hofing who was asked:

Q: Was this transfer of Jordan stock to Garner Technology Associates planned or contemplated by you and Mr. Gardner before you acquired the stock from Rothrock and Surnamer?

A: Not that I know of

Defendants' reply memorandum in support of their motion for summary judgment, Exhibit I, Hofing Deposition at 39.[5] Thus

it appears that plaintiffs' theory that they were acting as agents of an undisclosed principal is devoid of merit.[6]

Plaintiffs also contend that they can maintain this suit even if GTA was not the real purchaser from defendants, because GTA had a cause of action independent from any which may have arisen as a result of plaintiffs' putative agency relationship with it. In essence, plaintiffs argue that GTA had a cause of action against defendants even though it purchased the securities in question from plaintiffs.

Both § 10(b) and Rule 10b–5 require that a fraud be "in connection with the purchase or sale of" securities. There are really two elements to this requirement. The first is that plaintiff be within a class of plaintiffs who are buyers or sellers of securities. The second is that the fraud be related to purchase or sale in some way and that the damages thereby suffered were caused by the fraud. Under the facts of the present case there can be little doubt that GTA falls within the class of purchasers or sellers. The starting point for any analysis of a "purchase or sale" problem under this section is the Supreme Court's decision in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). In *Blue Chip*, the Court approved the *"Birnbaum* Rule"[7] which limited private damage actions under § 10(b) to actual purchasers and sellers. Defendants would apparently read this to preclude

---

5. I am deeply troubled by the unexplained inconsistency between the deposition of Hofing and his January, 1985 affidavit in which he stated, "William Gardner and Hofing entered into the Agreement dated September 10, 1981 with defendants Surnamer and Rothrock for GTA, *their undisclosed principal.*" Hofing Affidavit ¶ 4. Obviously, one cannot be an agent of an undisclosed principal unless that relationship has been created before the transaction took place. Moreover, an agency relationship of this kind cannot exist if a transfer of the stock to GTA was not contemplated before the plaintiffs actually purchased it from defendants.

6. Defendants also contend that the agency relationship asserted by plaintiffs cannot be reconciled with the creation date of GTA. The parties

do not seem to dispute the fact that GTA'S certificate was not filed with the Secretary of State until December 7, 1981. The date of filing is not itself, however, dispositive of the formation date of GTA. *See* 59 Pa.Cons.Stat.Ann. § 512(b) (Purdon Supp.1984); *see also Ruth v. Crane*, 392 F.Supp. 724, 733 (E.D.Pa.1975), *aff'd*, 564 F.2d 90 (3rd Cir.1977). Although *Ruth* was decided under the old Limited Partnership Act, 59 P.S. § 1 et seq., *repealed*, Dec. 19, 1975, P.L. 524, No. 155 § 2, the new Act incorporates some aspects of the older act. *See,* 59 Pa.Cons.Stat.Ann. § 512(b).

7. *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.) *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).

GTA from bringing this suit because it was not *the* purchaser of securities from defendants. I believe that this reads too much into *Blue Chip,* however. *Blue Chip* and *Birnbaum* both dealt with the distinction between real purchasers and sellers and potential purchasers and sellers. In limiting the class of potential plaintiffs in § 10(b) actions to actual purchasers or sellers, the court recognized that to do otherwise would make anyone a potential plaintiff. *Id.* at 739–40, 95 S.Ct. at 1927–28. The Court desired to prevent a wave of vexatious litigation brought by speculators and others who could allege that their decision to purchase or sell was in some way affected, to their detriment, by the defendant's fraud. The court feared that these suits would be too easy to bring, would not be amenable to disposition before trial and would therefore result in large unwarranted settlements which would eventually harm the shareholders. *Id.* at 742–43, 95 S.Ct. at 1928–29. These principles really refer, not to the identity of the parties but to their nature. That is, the controlling factor under *Blue Chip* was not a lack of formal privity, but rather the court's concern with the policy implications of removing the barriers against litigation by persons who did not have the "proof" of injury demonstrated by their status as a real purchaser or seller.

The "in connection with" requirements present a more difficult question. Defendants appear to argue that unless the fraud was committed by them at the time of the sale to GTA, the partnership would not have the standing to bring this suit. Basically, defendants would have me equate "in connection with" with a requirement that the plaintiff and defendant be in some form of privity (presumably privity of contract).

In the instant case, GTA is a subsequent buyer who allegedly suffered injury at the hands of defendants. Defendants and GTA are separated by a set of intervening parties: plaintiffs. The question before me is whether GTA as a subsequent, injured buyer not in privity can maintain an action against defendants. GTA and the defendants are clearly not in any kind of privity.

The parties have not provided me with any cases which involve the same type of situation as is presented in this case. Indeed, I have found no case which squarely addresses the status of a would-be plaintiff who is a subsequent buyer.

Although some early decisions in this area seem to require at least "some semblance of privity", *Joseph v. Farnsworth Radio & Television Corp.,* 99 F.Supp. 701, 706 (S.D.N.Y.1951), *aff'd.,* 198 F.2d 883 (2d Cir.1952), the more recent cases take a much more relaxed view of the privity requirement. 3 A.R. Bromberg & L.D. Lowenfels, Securities Fraud & Commodities Fraud § 8.5(511), p. 207 (1984).

Perhaps the most compelling line of cases are those involving § 10(b) actions brought by open-market purchasers against issuers, insiders, or other nontrading parties. *See, e.g., Fischer v. Kletz,* 266 F.Supp. 180, 193 (S.D.N.Y.1967); *Brennan v. Midwestern United Life Ins. Co.,* 259 F.Supp. 673 (N.D.Ind.1966); *Drake v. Thor Power Tool Co.,* 282 F.Supp. 94 (N.D.Ill. 1967); *Miller v. Bargain City, U.S.A., Inc.,* 229 F.Supp. 33, 37 (E.D.Pa.1964). These cases demonstrate that there is no requirement that a plaintiff be in privity with a defendant as long as the "in connection with" requirement is met. If a plaintiff is a purchaser or seller of a security, the question is then whether the fraud committed was in connection with that purchase or sale.

■ In the present case, plaintiffs allege that the fraud was committed at the time that the original sale between themselves and defendants was consummated. The fraud was not discovered, however, until the stock had passed into the hands of GTA. Although I have located no cases directly on point, I have concluded that GTA had sufficient standing to bring an action against defendants.

There are compelling policy arguments in favor of this conclusion. If a subsequent buyer could not bring suit against a fraudulent seller "once removed" for damages suffered as a result of that fraud, the remedial purposes of the act would be compromised. *See Texas Continental Life Ins. Co. v. Dunne*, 307 F.2d 242, 249 (6th Cir.1962). Fraudulent sellers could insulate themselves from liability by concealing a fraud and then ensuring that the purchasers transferred the securities to another party. Where, as here, a plaintiff is within the class of purchasers or sellers, the fraud was committed in connection with that sale or purchase of securities, and the plaintiff has been damaged by the fraud, a claim under § 10(b) or Rule 10b–5 has been stated.[8]

In the instant case, I believe that defendant has failed to show that these elements are lacking as a matter of law or that there exists no genuine issue of material fact.

Based on the foregoing, I will deny defendants' motions for summary judgment. An appropriate order follows.

---

**8.** In *Lowry*, the Third Circuit held that there was no automatic assignment of a cause of action under the securities law upon the sale of the security. At first blush, this result may seem inconsistent with the result I have reached in this case. It is not. Plaintiffs in *Lowry* had bought the securities in question there after the fraud had become public, they therefore were not injured in the sense that they had bought with at least constructive knowledge of the fraud. 707 F.2d at 721. Although many of the plaintiffs there may have been in exactly the same relationship with the defendant issuer as GTA was with defendants herein, they lacked the injury resulting from the sale or purchase that GTA has.